IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
_____

ELSA WAITHE

                          PLAINTIFF,

            -versus-

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY
and POLICE OFFICERS "JOHN DOES" 1-4,

                       DEFENDANTS

INDEX NO.15cv6651 (ENV)(RML)
ECF CASE

FIRST AMENDED
COMPLAINT

JURY TRIAL DEMANDED

Plaintiff ELSA WAITHE, by her attorney, SAMUEL B. COHEN, complaining of the defendants, respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

1.    Plaintiff ELSA WAITHE brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 for violations of her civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.    On April 14, 2015, Plaintiff ELSA WAITHE was present at a "Black Lives Matter" demonstration in downtown Brooklyn as a member of "Cop Watch," a group of citizen journalists who document interactions between police and civilians at demonstrations and at other times.  As Plaintiff was attempting to document an apparent excessively forceful arrest of a demonstrator from a safe distance, Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and one or more of the Defendant NEW YORK CITY POLICE OFFICERS "JOHN DOES" forcefully shoved Plaintiff without provocation or proper cause, sending Plaintiff airborne. Plaintiff landed with her back impacting the railing of a metal tree guard. As a result, Plaintiff was taken from the scene in an ambulance, and suffered acute head trauma and bruised rib(s). No charges were filed against Plaintiff. This incident has been investigated by the CCRB, NYPD Internal Affairs, and the Kings County District Attorney's office, but Plaintiff has not been informed of the outcome of any of said investigations.

## II. JURISDICTION

3.    This action is brought pursuant to 42 U.S.C. § 1983, and the First, Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C.

§§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

4.     Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

5.     Plaintiff ELSA WAITHE has complied with all relevant provisions of General Municipal Law §50 in providing notice to Defendant City of New York.

6.     At least thirty days have elapsed since Plaintiff ELSA WAITHE filed her Notices of Claim and adjustment or payment thereof have been neglected or refused.  This action is commenced within one year and 90 days from the date of the occurrences alleged herein, as required under Section 50-i of the General Municipal Law.

### III. VENUE

7.     Venue is proper for the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the acts complained-of herein occurred in this district.

### IV. JURY DEMAND

8.     Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

### V. THE PARTIES

9.     Plaintiff ELSA WAITHE is an African-American female and resides in Kings County, New York.

10.    Defendant The City of New York is a municipal corporation organized under the laws of the State of New York.

11.    Defendant the City of New York maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

12.    At all times relevant to this action, Defendants NEW YORK CITY POLICE OFFICER KAZ

DAUGHTRY and NEW YORK CITY POLICE OFFICERS "JOHN DOES" 1-4 were duly sworn police officers of said department and were acting under the supervision of said department and according to their respective official duties.

13.    Plaintiffs will amend this complaint to name each of the Defendant NEW YORK CITY POLICE OFFICERS "John Does" 1-4 as their identities can be established to a reasonable certainty.

14.    Hereinafter the Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant NEW YORK CITY POLICE OFFICERS "John Does" 1-4, may be referred to collectively as "the Defendant POLICE OFFICERS", and individually as "Defendant POLICE OFFICER."

15.    That at all times hereinafter mentioned the Defendant POLICE OFFICERS were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

16.    Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting in furtherance and within the scope of their employment by Defendant CITY OF NEW YORK.

## VI. FACTS COMMON TO ALL CLAIMS

17.    On April 14, 2015, Plaintiff was present as a demonstration associated with the "Black Lives Matter" movement as a member of "Cop Watch."

## BLACK LIVES MATTER

18.    Black Lives Matter is a movement of individuals and ideas that seek, *inter alia*, to call attention to and change inequalities and ill effects created through systems of structural racism in American society, including, but not limited to, police brutality against African Americans, which prevent a vast majority of individuals from enjoying the rights, liberties, and freedoms guaranteed to them by the United States Constitution.

19.    The Black Lives Matter movement was formed in the wake of the July 2013 acquittal of George Zimmerman in the shooting death of Trayvon Martin, and gained widespread national support following the deaths of Michael Brown and Eric Garner, both unarmed African Americans killed by police officers July and August 2014.

20.   Black Lives Matter demonstrations have been the subject of intense police scrutiny and surveillance in New York.

21.   While the MTA has released copious records of their surveillance of Black Lives Matter demonstrations in response to FOIL requests, the NYPD has declined to respond to substantially identical FOIL requests.

22.   On information and belief, founded on review of materials and intraagency communications released by the MTA in compliance with FOIL, the NYPD and Defendant CITY OF NEW YORK maintain surveillance of lawful Black Lives Matter protests and protest figures in violation of the *Handschu* consent decree.

23.   On information and belief, founded on review of materials and intraagency communications released by the MTA in compliance with FOIL, the NYPD and Defendant CITY OF NEW YORK maintain surveillance of lawful Black Lives Matter protests and protest figures in violation of the *Handschu Guidelines*, as outlined in the NYPD Patrol Guide Section 217-72 and Appendix A thereto.[1]

**COP WATCH**

24.   Cop Watch is a community organization that aims to hold police officers accountable for misconduct by increasing transparency in police/civilian interactions, by means including but not limited to videotaping interactions between police officers and civilians.

25.   Documents released by the MTA in compliance with FOIL show that the MTA PD was aware of the identity of one of Cop Watch's primary organizers, whose name is in care of Plaintiff's Counsel,

---

[1]  The *Handschu Guidelines*, as amended, limit the investigation of political activity to those circumstances not based solely on activities protected by the First Amendment, but which include either specific information of criminal activity, or call for criminal acts of violence. Specifically, after the September 11, 2001 terrorist attacks, the *Handschu Guidelines* were modified to give the NYPD greater leeway to investigate terrorism; however, *Handschu Guidelines* still prohibit the NYPD from investigating political activities in the absence of credible evidence that those activities call for criminal acts, specifically acts of violent terrorism. The *Handschu Guidelines*, as amended, are incorporated by reference herein.

and shared surveillance information regarding his movements with the NYPD.

26.   On information and belief, this sharing of surveillance information with respect to the movements and activities of a police accountability advocate violates the spirit, if not the letter, of the *Handschu* guidelines.

27.   On information and belief, the NYPD is hostile to "Cop Watch," and generally hostile to individuals and organizations demanding police accountability and reform.

**APRIL 14, 2015**

28.   On April 14, 2015, Plaintiff ELSA WAITHE was documenting interactions between civilians and police at a Black Lives Matter demonstration in downtown Brooklyn.

29.   In so doing, Plaintiff was present in her capacity as a citizen journalist, in exercise of her First Amendment rights.

30.   Near the corner of Flatbush Avenue and Sterling Place, Plaintiff ELSA WAITHE observed several police officers pushing a protester against a wall with apparent excessive force.

31.   Plaintiff ELSA WAITHE switched her phone to video record and moved closer to the arrest in progress.

32.   Plaintiff ELSA WAITHE had observed numerous other arrests, and knew to keep a safe distance from the officers arresting the protester.

33.   Plaintiff ELSA WAITHE kept a safe distance from the officers arresting the protester.

34.   Plaintiff ELSA WAITHE did not intend to interfere with the arrest of the protester.

35.   As Plaintiff ELSA WAITHE was moving towards the vicinity of the arrest in progress and readying to record, she was shoved violently, without warning, by Defendant NEW YORK CITY

POLICE OFFICER KAZ DAUGHTRY and one or more of the other Defendant POLICE OFFICERS.

36.    Plaintiff ELSA WAITHE was sent airborne by the force of the Defendant POLICE OFFICERS' shove.

37.    Upon information and belief, the Defendant POLICE OFFICERS who shoved Plaintiff also knocked down a legal observer for the National Lawyers Guild.

38.    Upon information and belief, the Defendant POLICE OFFICERS intentionally assaulted Plaintiff and the NLG legal observer in her vicinity to prevent them from documenting police interactions in the course of the arrest of the seized protester.

39.    As a result of Defendants' application of force, Plaintiff ELSA WAITHE landed forcefully, striking her back against a metal tree guard railing.

40.    Defendants failed to exercise due care in their seizure and application of force against Plaintiff.

41.    Plaintiff was injured as a result of the Defendant POLICE OFFICERS' conduct.

42.    Plaintiff was not arrested in connection with the Black Lives Matter demonstration on April 14, 2015.

43.    Plaintiff was transported to New York Methodist Hospital from the scene of the incident by a New York City Fire Department ambulance at or around 6:45 PM.

44.    After plaintiff was examined, Doctors at New York Methodist Hospital diagnosed her with acute head trauma and bruised rib(s).

45.    Doctors at New York Methodist Hospital also noted that Plaintiff displayed bleeding in the brain.

46.    Upon information and belief, Plaintiff's injury greatly inhibited her ability to move and to stand.

47.   Plaintiff was forced to miss work as a result of her injuries and her hospital stay.

48.   Plaintiff was released from the hospital in the early hours of April 15, 2015.

49.   Plaintiff ELSA WAITHE participated in a CCRB investigation of the incident giving rise to this action.

50.   Plaintiff ELSA WAITHE participated in an NYPD IAB investigation of the incident giving rise to this action.

51.   Plaintiff ELSA WAITHE participated in a Kings County District Attorney's Office investigation of the incident giving rise to this action.

52.   To date, none of the investigating agencies have communicated to Plaintiff ELSA WAITHE whether they have identified the Defendant POLICE OFFICERS who assaulted Plaintiff, let alone whether disciplinary action has been taken against them.

53.   Despite the fact that the City of New York is constantly alive with citizens exercising their right to protest, Defendant CITY OF NEW YORK has continually failed to appropriately police the many non-violent and lawful expressions of speech, resulting in the continual breach of individual rights, the waste of judicial and civic resources, and the need for appropriate training policies, methodologies, and systems to address individuals conducting peaceful and legal expressive speech as protected under the First Amendment.

54.   The NYPD's officer training for protest activities provides inadequate constitutional guidance, and the NYPD's officer training fails to address or explain the First Amendment rights of participants in peaceful protest activities. Instead, the NYPD's officer training for protest activities focuses on training officers in various marching formations.

55.   The improper and unlawful polices and practices of the NYPD towards Black Lives Matter protesters are a continuation of the improper and unlawful policies and practices of the NYPD towards

Occupy Wall Street protesters in 2011 and 2012, which subjected the City of New York to dozens of lawsuits by Occupy Wall Street protesters. Additionally, the NYPD and the City of New York were the recipient of extensive public condemnation for their policies and practices towards Occupy Wall Street, resulting in international human rights and U.S. civil liberties experts working together and creating the *Protest and Assembly Project*, which in turn released the comprehensive report entitled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street on July 21, 2012*.[2] The Suppressing Protest Report documented numerous violations by the NYPD, such as retaliatory uses of force against protesters, journalists, and bystanders, arbitrary and selective rule enforcement, baseless arrests, unjustified closures of public space, and unfounded dispersals of peaceful assemblies.[3]

56.   Despite international condemnation for their policies and practices towards Occupy Wall Street in 2011 and 2012, the NYPD and the Defendant City of New York failed to rectify the defective and unlawful polices, customs, and practices of the NYPD, which has led to the arrests of numerous Black Lives Matter protesters engaged in lawful expressive speech activity.

57.   Further, just as the majority of Occupy Wall Street arrests in 2011 and 2012 resulted in dismissals, adjournments in contemplation of dismissal ("ACDs"), and declined prosecutions, the majority of Black Lives Matter arrests in 2014 and 2015 also resulted in dismissals, ACDs, and declined prosecutions.

58.   Since the inception of the Black Lives Matter movement, the NYPD has continually arrested, used excessive force, and retaliated against Black Lives Matter protesters for engaging in expressive speech activity.

59.   The first large Black Lives Matter Protest in New York City occurred on August 14, 2014, when demonstrators marched north from Union Square up 7th Avenue and Broadway to Times Square,

---

[2] The Global Justice Clinic (NYU School of Law), Walter Lestner Int'l Human Rights Clinic (Fordham Law School), *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (July 21, 2012). Incorporated by reference herein, and hereafter referred to as the "Suppressing Protest Report."
[3] Suppressing Protest Report at vi.

where the protesters were blocked from proceeding any further by the NYPD, who had set up barricades that formed choke points of ingress and egress. The Wire reported that during the August 14, 2014 Black Lives Matter demonstration in Times Square, the NYPD "arrest[ed] people for no reason, [and] push[ed] reporters out of the way."[4]

60.   These policies, practices, and failures in training were a cause of Plaintiffs' injuries.

61.   In recent years, the NYPD has followed an apparent custom, policy or practice of targeting both professional and citizen journalists for arrest and applications of force at times when said journalists are recording or otherwise documenting police interactions with civilians, in protest and other situations. This apparent custom, policy or practice has resulted in numerous unfounded criminal prosecutions and significant liability for the City of New York.[5]

62.   This apparent custom, policy or practice was a cause of the Plaintiff's injuries.

63.   In recent years, the NYPD has also followed an apparent custom, policy or practice of inappropriately monitoring and targeting peaceful Black Lives Matter protesters and employing

---

[4] Polly Mosenda, *Michael Brown Protests Spread to Times Square*, THE WIRE (Aug. 14, 2014 11:03PM ET),
 http://www.thewire.com/national/2014/08/michael-brown-protests-spread-to-times-square/376125/. Incorporated by reference herein.

[5] *See, e.g.*, Winnie Hu, *New York Police Officer Is Convicted of Lying About Photographer's Arrest*, N.Y. TIMES (Oct. 15, 2015), http://www.nytimes.com/2015/10/16/nyregion/new-york-police-officer-is-convicted-of-lying-about-photographers-arrest.html?_r=0 (describing felony conviction of NYPD Officer who swore to false and unfounded charges against press photographer Robert Stolarik to justify arrest and use of force against same); Anna Merlan, *City Will Pay $55,000 To Settle Case Of Occupy Livestreamer Josh Boss, Tackled By High-Ranking Nypd Chief*, VILLAGE VOICE, (Apr. 24, 2014), *available at* http://www.villagevoice.com/news/city-will-pay-55-000-to-settle-case-of-occupy-livestreamer-josh-boss-tackled-by-high-ranking-nypd-chief-6675429 (coverage and multiple videos of NYPD Chief Thomas Purtell physically tackling and seizing videographer at peaceful march, subordinate officer cheering "Kick His Ass, Tom!" as Purtell strikes Boss without apparent justification); *see, e.g.*, Nikko Koppel, *When Photographs Become Evidence*, N.Y. TIMES, (Nov. 5, 2015) ("Indeed, on Thee Rant, a message board described as 'New York City cops speaking their minds,' one commenter, dominop, responded to a post about Officer Ackermann's conviction: 'Lock up everyone in or connected with the press that you can, every chance you get! Know your enemy!'"). Articles cited above incorporated by reference herein.

extraordinary police enforcement tactics against Black Lives Matter protesters, and justifying the use of such inappropriate tactics by conflating peaceful protesters with violent terrorists.

64.    Specifically, in January 2015, NYPD Commissioner William Bratton announced that the NYPD was creating a new heavily armed unit—the Strategic Response Group—which is "designed for dealing with events like our recent [Black Lives Matter] protests, or incidents [of violent terrorist attacks] like Mumbai or what just happened in Paris." Bratton added that, "They'll be equipped with all the extra heavy protective gear, with the long rifles and machine guns—unfortunately sometimes necessary in these instances."[6]

65.    Shortly thereafter, in February 2015, at a New York state Senate hearing on protests against police brutality, NYPD Commissioner William Bratton asked lawmakers to elevate the crime of resisting arrest from a misdemeanor to a felony.[7] Arrestees going limp and forcing officers to carry them off to jail was a common tactic of the civil rights movement in the 1960s—and has been used by Black Lives Matter protesters in NYC and around the country—and is considered resisting arrest by the NYPD and other law enforcement agencies.

66.    The NYPD has a long history of engaging in unlawful profiling and targeting groups of citizens. As recently stated by the Third Circuit Court of Appeals with regard to the NYPD's practice of employing undercover and counterterrorism officers to spy on Muslim citizens in and around New York City,

> What occurs here in one guise is not new. We have been down similar roads before.
> Jewish-Americans during the Red Scare, African-Americans during the Civil Rights
> Movement, and Japanese-Americans during World War II are examples that readily
> spring to mind. We are left to wonder why we cannot see with foresight what we see so

---

[6] *Commissioner Bratton Unveils Plans For New High-Tech Anti-Terror Police Unit,* CBS NEW YORK (Jan. 29, 2015 5:51 PM),
http://newyork.cbslocal.com/2015/01/29/bratton-unveils-plans-for-new-anti-terror-police-unit/.
Incorporated by reference.
[7] *NYPD's Top Cop Wants To Make It A Felony to Resist Arrest*, NPR (Feb. 10, 2015 1:39 PM),
http://www.npr.org/sections/codeswitch/2015/02/10/384990293/nypds-top-cop-wants-to-make-it-a-felony-to-resist-arrest. Incorporated by reference.

clearly with hindsight—that "[l]oyalty is a matter of the heart and mind[,] not race, creed, or color."[8]

67.    These policies, practices, customs and failures in training and supervision were all causes of Plaintiffs' injury.

---

**FIRST CLAIM FOR RELIEF**

**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

68.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

69.    All of the aforementioned acts of the Defendant CITY OF NEW YORK, and the individual Defendants and their agents, servants and employees, were carried out under the color of state law.

70.    All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

71.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

72.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

73.    The individual Defendants, and Defendant CITY OF NEW YORK, collectively and

---

[8] *Hassan v. City of New York*, No. 14-1688 (3d Cir. Oct. 13, 2015), *quoting Ex parte Mitsuye Endo*, 323 U.S. 283, 302 (1944).

individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

74.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and loss of wages, and damage to their reputations and standings within their communities.

75.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF
## EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

76.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

77.    Defendants administered a violent shove upon Plaintiff ELSA WAITHE in the absence of need for such action and force.

78.    Plaintiff was not breaking any laws.

79.    Plaintiff was not interfering with any Defendant POLICE OFFICER in the execution of any lawful duty.

80.    The level of force employed by Defendants against Plaintiffs was objectively unreasonable.

81.    The force employed by Defendants against Plaintiffs did not advance any proper governmental objective.

82.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer

personal injuries, violation of her civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages, and damage to her reputation and standing within her communities.

83. As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### THIRD CLAIM FOR RELIEF
### <u>RETALIATION FOR FIRST AMENDMENT PROTECTED EXPRESSION</u>
### <u>UNDER 42 U.S.C. § 1983</u>

84. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

85. At or around the time that Plaintiff came into contact with Defendant POLICE OFFICERS, Plaintiff was or had recently been engaging in protected speech and conduct, including but not limited to documenting police conduct with respect to persons peaceably assembling in public streets for the purpose of engaging in First Amendment protected expression related to critical social issues; and walking and being present in proximity with persons peaceably assembling in public streets for the purpose of engaging in First Amendment protected expression related to critical social issues.

86. Defendant POLICE OFFICERS took adverse action against Plaintiff and another individual, a National Lawyers Guild Legal Observer, for engaging in such protected speech and conduct.

87. Defendant POLICE OFFICERS took adverse action against Plaintiff and another individual, a National Lawyers Guild Legal Observer, by using wrongful and unjustified force upon them.

88. There was a causal connection between the protected speech and conduct engaged in by Plaintiff and in proximity to Plaintiff and the adverse actions taken by Defendant "JOHN DOE" POLICE OFFICERS, in that Defendants engaged in unjustified violent action to prevent Plaintiff and another observer from documenting the arrest of a third person, and by doing so, succeeded in preventing Plaintiff from documenting law enforcement conduct.

13

89.    The causal connection between the protected speech and conduct engaged in by Plaintiff and by those in proximity to Plaintiff, and the adverse actions taken against Plaintiff by Defendant POLICE OFFICERS was demonstrated by, among other things, the fact that members of the NYPD have previously and on multiple occasions subsequent employed excessive force in the context of peaceful First Amendment protected expression relating to social issues, in contexts including but not limited to the 2004 RNC, and at subsequent Occupy Wall Street related protests including but not limited to mass arrests undertaken in the vicinity of Union Square on September 24, 2011 and at points thereafter. *See, e.g.*, *Dierken et al v. City of New York et al.*, SDNY 12cv7462(RWS) (Judgment entered pursuant to FRCP 68 on claims that unidentified defendant officer seized plaintiff citizen journalist and ran him head first into parked car, before arresting him on later-voided charges); Anna Merlan, *City Will Pay $55,000 To Settle Case Of Occupy Livestreamer Josh Boss, Tackled By High-Ranking Nypd Chief*, VILLAGE VOICE, (Apr. 24, 2014).

90.    The actions of Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant "JOHN DOE" POLICE OFFICERS 1-4 heretofore described, constituted excessive force, assault and battery and were designed to and did cause bodily harm, pain and suffering both in violation of Plaintiffs' Constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, First Amendment and the Constitution of the State of New York and in direct retaliation for the Plaintiffs' exercise of their civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

91.    That the conduct and actions of Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant "JOHN DOE" POLICE OFFICERS 1-4 acting under color of State law, in assaulting and battering the Plaintiff were done intentionally, maliciously, and/or with a reckless disregard for the natural and probable consequences of their acts, were done without lawful

justification, and were designed to and did cause bodily harm, pain and suffering both in violation of the Plaintiffs' Constitutional rights as guaranteed under 42 U.S.C. §1983, the United States Constitution, First Amendment and the Constitution of the State of New York and in direct retaliation for the Plaintiff's exercise of her civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

92.   Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant "JOHN DOE" POLICE OFFICERS 1-4's actions were undertaken under color of law and would not have existed but for Defendants using their official power.

93.   As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of wages and damage to her reputation and standing within her community.

94.   As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**FAILURE TO INTERVENE UNDER 42 U.S.C. § 1983**

95.   Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

96.   Each of the Defendant POLICE OFFICERS had an affirmative duty to intervene on Plaintiff's behalf, to prevent the violation of Plaintiffs' constitutional rights.

97.   Each of the Defendant POLICE OFFICERS failed to intervene on Plaintiff's behalf in order to prevent the violation of their constitutional rights despite having had realistic opportunities to do so.

98.   Each of the Defendant POLICE OFFICERS failed to intervene on Plaintiff's behalf, to prevent the violation of Plaintiff's constitutional rights despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by the Defendants' affirmative conduct.

99.   As a result of the aforementioned conduct of the individual Defendants, Plaintiff's constitutional rights were violated.

100.  Plaintiff demands compensatory and punitive damages in a sum of money to be determined at trial, together with attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF
## EQUAL PROTECTION UNDER 42 U.S.C. § 1983

101.  Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

102.  That at all times described herein, Plaintiff was possessed of the right to equal protection under the laws, as guaranteed under the 14th Amendment to the United States Constitution.

103.   The defendants subjected Plaintiff to assault, battery, use of excessive force and other violations of Plaintiff's Constitutional rights in the manner described herein because they knew that they could do so with impunity.

104.  The defendants' particular acts of subjecting Plaintiff to assault, battery, use of excessive force and other violations of Plaintiff's constitutional rights in the manner described herein, were the result of a perceived ease of perpetrating violence against minority, working-class individuals.

105.  The defendants undertook the particular actions described herein against Plaintiff because Plaintiff is an African-American woman; the Defendant POLICE OFFICERS would not have undertaken against others similarly situated, in whole or in part due to the Plaintiff's ethnicity.

106.  As a result of the aforementioned conduct, the Defendants violated Plaintiff's constitutional

16

rights to equal protection under the law.

107.  As a result, Plaintiff was harmed.

108.  As a result of Defendants' impermissible conduct, Plaintiff demands judgment against

defendants in a sum of money to be determined at trial.


**SIXTH CLAIM FOR RELIEF**
**MUNICIPAL LIABILITY UNDER *MONELL***

109.  Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above

paragraphs with the same force and effect as if fully set forth herein.

110.  The actions of Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the

Defendant "JOHN DOE" POLICE OFFICERS 1-4 described above are consistent with

constitutionally-violative NYPD customs, policies, or practices described above, and/or with failures

of training to address NYPD customs, policies or practices that are likely to cause violations of

individuals constitutional rights, as described above.

111.  The NYPD and Defendant CITY OF NEW YORK had or should have had notice that the

actions of Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant

"JOHN DOE" POLICE OFFICERS 1-4 relating to the incident were likely to take place as a natural

result of their customs, policies or practices described above.

112.  The NYPD and Defendant CITY OF NEW YORK had or should have had notice that the

actions of Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant

"JOHN DOE" POLICE OFFICERS 1-4 relating to the incident were likely to take place as a natural

result of their failure to remedy through training the certainty that the customs, policies or practices

described above could lead to violations of individuals' constitutional rights.

113.  The NYPD's officer training for protest activities provides inadequate constitutional guidance, and the NYPD's officer training fails to address or explain the First Amendment rights of participants in peaceful protest activities. Instead, the NYPD's officer training for protest activities focuses on training officers in various marching formations.

114.  The acts of Defendant POLICE OFFICERS in relation to the incident were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY OF NEW YORK and its agency, the NYPD.

115.  Defendant CITY OF NEW YORK and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

116.  The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD.

117.  Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons engaged in the practice of exercising their First Amendment Protected rights to free speech and association.

118.  Witnesses have observed NYPD officers who have been assigned to perform crowd control duties and overall help provide for individuals' safety instead strike, beat, and otherwise berate civilians without reason, without notice, and without consequence; to wit, "One protestor . . . reported being punched in the left temple by an officer, without any apparent provocation or notice [and thereafter] [t]he punch led to swelling, bleeding, bruising, dizzy spells, and nausea [which required] the individual [to seek] emergency medical treatment[,]" further, "[one legal observer who was also a

retired New York Supreme Court judge] . . . witnessed an officer throw a woman to the ground 'out of nowhere' and hit her in the head[,]" and still further, "[one video from an OWS event] shows that an officer approached a woman from behind and grabbed her by the strap of her backpack and her scarf for no apparent reason[;] the officer [then] began to pull the woman towards him . . . for approximately fifteen seconds, and appeared to possibly be choking her via the strap of her scarf [and after this incident] the police appeared not to take any action [against the officer]." *See* Suppressing Protest Report at 73, 74, and "Appendix I[:] Table of Alleged Police Use of Force Incidents."

119.  More specific incidents of excessive force by NYPD officers appear in The Report; wherein the authors state, "A significant number of incidents were reported on March 17-18"; to wit, "[despite the fact that] there [have been] no reports or indications of any imminent or ongoing criminal activity or danger to public safety posed by the [March 17th] assembly," . . . "[o]ne journalist described incidents of NYPD officers' use of excessive force including though not limited to, "punch[ing] a woman in the side of her head, and repeatedly shov[ing] protestors from behind[,]" further "[an officer responding to a protester who was approaching him in order to greet him by] shov[ing] him twice hard in the chest[,]" and still further, "after [the officers' order to disperse that evening officers were seen] slam[ming] an Occupy [volunteer] [para]medic's head into a glass door, [with such force that the glass was smashed]." *See* Suppressing Protest Report at 74, and 75. (emphasis added).

120.  The Report posits how, following incidents of police brutality such as these, the conduct of the NYPD in response to OWS assemblies, marches, and events has and continues to cause "[p]rotestors [to] reasonably perceive that they cannot safely protest [and thus remain] constantly on guard for potential arbitrary police force, or decide to leave the assembly[,]"; and as a result OWS participants, observers, and bystanders and civilians generally "view a[n] NYPD officer as someone who can take out [his] baton and beat [an individual] and face no repercussion." *See* Suppressing Protest Report at 81.

121.  Or further, stated differently by a graduate student who had attended multiple OWS events before and leading up to The Report's publication, "'It's a shock when you expect police to protect you, but you see them beat people . . . [I] grew up thinking that the cops are 'the good guys' but . . . when you see them beat people for no reason, it changes your world. You don't feel safe." *See* Suppressing Protest Report at 82.

122.  In suggesting positive changes that the NYPD should employ to effectively curb and prevent its officers from engaging in repeated, continuing and widespread acts of excessive force in response to OWS assemblies, marches, and events specifically and individuals' exercising of their First Amendment protected rights generally, The Report states, "[Government agencies] have an international legal obligation to investigate, prosecute, and remedy human rights violations[;] [t]his obligation requires [government agencies] to have in place systems that enable individuals to have 'accessible and effective remedies' to vindicate their rights . . . [t]he obligation to investigate and punish violations 'requires that not only the direct perpetrators of human rights violations be punished.'" *See* Suppressing Protest Report at 68.

123.  Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force in order to effectively chill protest participants', observers', and bystanders' specific as well as individuals' general exercise of their First Amendment protected rights to free speech, expression, and association, but has failed to take action to remedy the problem.

124.  Upon information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality utilized in order to effectively chill civilians' exercise of their First Amendment protected rights, instead choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

125.  Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the continuation of the practice and custom of NYPD officers' use of excessive force and police brutality in order to effectively chill civilians' exercise of their First Amendment protected rights.

126.  Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the continuation of the practice and custom of NYPD officers' use of excessive force and police brutality in order to effectively chill civilians' exercise of their First Amendment protected rights.

127.  The following are examples of situation in which NYPD officers have violently retaliated against citizens who were filming interactions between NYPD officers and citizens, and are representative of the customs, policies, usages, or practices described above:

    a.  In 2014, Shawn Thomas was videotaping an arrest from a distance at a subway station in Brooklyn when NYPD Police Officer Efrain Rojas approached Thomas and begun recording Thomas with his cell phone and otherwise harassing him. After a verbal exchange, Officer Rojas escorted Thomas out of the station. Rojas allegedly took the batteries out of Thomas's camera. When Thomas took out his Blackberry to continue recording, Officer Rojas knocked the phone out of Thomas's hand, grabbed the back of his head and slammed it into the pavement. Thomas was arrested and charged with resisting arrest, disorderly conduct, trespassing, and obstructing governmental administration. (http://www.nydailynews.com/new-york/brooklyn/allegedly-assaults-man-recording-article-1.1620037).

    b.  On June 5, 2012, Hadiyah Charles was videotaping NYPD police officers searching

three young men she knew when she was shoved by one of the officers and was subsequently arrested. (http://www.dnainfo.com/new-york/20121217/bedford-stuyvesant/bed-stuy-woman-arrested-after-taping-stop-and-frisk-sues-nypd).

c. After being labeled "professional agitators" by the NYPD and put on wanted posters, Christina Gonzalez and Matthew Swaye were filming a "stop-and-frisk" traffic stop in May of 2013. When Gonzalez asked the police officer what what going on, the police officer asked Gonzalez for identification. When she refused, the police officer grabbed her and arrested both her and Swaye. Gonzalez and Swaye were charged with obstructing governmental administration, disorderly conduct and resisting arrest. (http://www.dnainfo.com/new-york/20130521/central-harlem/professional-agitators-on-nypd-wanted-flier-arrested-after-filming-stop)

d. On March 13, 2013 in the South Bronx, Ed Garcia Conde was accused by NYPD Sergeant Delgado of carrying an open container while trying to dispose of a broken beer bottle. Delgado's aggressive attitude prompted Conde to begin recording the interaction. Sergeant Delgado told Conde to put down the camera. When Conde refused, Sergeant Delgado and two (2) other NYPD police officers slammed Conde against a building and arrested him. (http://www.welcome2melrose.com/wordpress/2013/03/high-on-power-nypd-officers-from-the-40th-precinct-continue-their-oppression-on-the-community/)

e. In 2012, Robert Stolarik, a freelance photographer for The New York Times was on assignment, photographing an arrest of a teenage girl when he was instructed to stop doing so. After identifying himself as a photographer for the New York Times, a second officer grabbed Stolarik's camera and slammed it into his face. When Stolarik asked for the officers' badge numbers, the officers took Stolarik's camera and dragged him to the ground before kicking him in the back, scraping and bruising him in the process.

Stolarik was arrested. (http://www.nytimes.com/2012/08/06/nyregion/robert-stolarik-times-photographer-is-arrested-while-on-assignment-in-the-bronx.html?_r=2)

f.  In August of 2013, NYPD Police Officers assaulted, battered, and arrested Jonathan Harris, an 18-year-old college student who was videotaping the police officers while they assaulted, battered, and cuffed three (3) Bronx siblings, aged 12, 14 and 15, respectively. The two younger sisters had been playing handball when they were escorted out of the park they were playing in. Both girls had been pushed to the ground and had their hijabs—Muslim headscarves—ripped off when their older ran outside, only to also be pushed to the ground and put in handcuffs. One officer singled out Harris and said, "come here, you little motherf—er. You like recording?" The officers then tackled him, wrenched his arm behind his back and punched him in his eye before arresting him. Harris was charged with disorderly conduct and obstructing governmental function. (http://www.nydailynews.com/new-york/bronx/teens-mauled-cops-article-1.1440394#ixzz2eVh68jgw).

128.  Upon information and belief, these examples represent only a small fraction of the total number of instances of NYPD members interfering with the rights of individuals who, without interfering with police officers, are recording or attempting to record police performing their official duties while in public.

129.  The NYPD has received numerous letters in recent years describing attempts by NYPD officers to intimidate individuals seeking to document police activity. In a letter to then Deputy Commissioner Paul Browne dated November 21, 2011, representatives of The New York Times, The New York Post, the Daily News, the Associated Press and nine other news organizations described numerous incidents in which NYPD officers assaulted and detained members of the media and otherwise interfered with their ability to document Occupy Wall Street demonstrations. The letter requested a meeting with

Deputy Commissioner Browne and then Commissioner Raymond Kelly to discuss the deteriorating relationship between the NYPD and the media. The meeting occurred on November 23, 2011. In response to the meeting, Commissioner Kelly merely issued a "FINEST message," reminding officers of their obligations to cooperate with members of the media. Upon information or belief, neither Commissioner Kelly nor any other NYPD official has initiated any further training. These news organizations sent a follow up letter to Deputy Commissioner Browne on October 1, 2012 outlining additional infringements on the rights of members of the news media to document police activity. In addition, The General Counsel of the National Press Photographer's Association (NPPA) sent a letter to Deputy Commissioner Browne on August 16, 2012 regarding the unlawful arrest of Robert Stolarik (discussed above). Mr. Stolarik's arrest and detention received widespread media coverage, and the charges against him were subsequently dismissed.  As noted above, the officer who arrested Mr. Stolarik has since been convicted of a felony for his improper acts.

130.  The violation of Plaintiff Else Waithe's rights was a direct result of the deficiency in training and supervision of Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant "JOHN DOE" POLICE OFFICERS 1-4. These officers were at least insufficiently trained on how to respect the rights of individuals attempting to record police officers performing their official duties, as required by the NYPD Patrol Guide. Upon information and belief, the current training for NYPD officers does not include sufficient training on the circumstances under which officers must allow people who observe police activity and record it. This pattern of continuing practice has or should have provided notice to policymaking officials of the CITY OF NEW YORK and the NYPD.

131.  NYPD's policy, practice and custom of interfering with the rights of indiciduals who, without interfering with police activity, are recording or attempting to record police activity is so persistent, widespread and pervasive as to constitute a 'custom or usage' and imply the constructive knowledge or acquiescence of policymaking officials. The numerous instances of abuse, a small number of which are

mentioned above, the fact that several incidents were discussed in newspapers and on blogs (as were cited above), and the high ranking NYPD members who received letters complaining about these types of abuses demonstrates that the policymakers were aware, or should have been aware of their subordinates' unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions. This practice and custom of NYPD members violating the constitutional rights of individuals recording or attempting to record NYPD officers is so persistent, widespread, and pervasive and the need for corrective action is so obvious, that the supervising policymakers' failure to take action gives rise to an inference of their deliberate indifference, and their inaction constitutes a deliberate choice. Further, these policymaking officials' deliberate indifference to the constitutional deprivations caused by subordinates and their acquiescence may be properly thought of as a City policy, practice or custom.

132. Defendant CITY, by and through its policymakers and agents, condoned, permitted, encouraged and/or ratified NYPD policies, practices and/or customs that permitted NYPD officers to recklessly disregard the rights of individuals who were recording or attempting to record police officers performing their official duties in public.

133. Defendant CITY by and through its agents acted with deliberate indifference to the rights of individuals which whom their employees were known to come into contact, including Plaintiff.

134. The policies practices and/or customs served to ratify or tacitly authorize the unconstitutional actions of the employees and agents of Defendant CITY, cause Plaintiff to suffer constitutional violations, and were the impetus for said deprivations.

135. Defendant CITY failed to train and supervise its officials, employees and agents, including Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant "JOHN DOE" POLICE OFFICERS 1-4, regarding how to respect the rights of individuals attempting to record police officers performing their official duties so as to prevent the battering of Plaintiff, which was

coincident to and/or resulted in the violation of her rights under the First Amendment to the Constitution of the United States and 42 U.S.C. §1983.

136.  Defendant CITY's failure to train and supervise amounts to deliberate indifference to the rights of persons with whom Defendants came into contact, including Plaintiff.

137.  As a result of Defendants' impermissible conduct, Plaintiffs demands judgment against Defendants in a sum of money to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### ASSAULT (State Law)

138.  Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

139.  Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant "JOHN DOE" POLICE OFFICERS 1-4  intentionally threatened imminent, offensive and harmful contact with Plaintiff.

140.  The Defendants' intentional threat of imminent, offensive, and harmful contact with Plaintiff put Plaintiff in apprehension of a battery from the Defendants.

141.  The Defendants' intentional threat of imminent, offensive, and harmful contact with Plaintiffs would put a reasonable person aware of the circumstances in apprehension of a battery from the Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant "JOHN DOE" POLICE OFFICERS 1-4.

142.  As a result of the Defendants' conduct, Plaintiff was caused to suffer physical as well as mental and emotional injuries, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, and humiliation.

143.  As a result of Defendants' impermissible conduct, Plaintiff demand judgment against defendants in a sum of money to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### BATTERY (State Law)

144.  Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

145.  Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant "JOHN DOE" POLICE OFFICERS 1-4 committed battery upon Plaintiff by violently shoving Plaintiff without justification for said contact.

146.  Defendant NEW YORK CITY POLICE OFFICER KAZ DAUGHTRY and the Defendant "JOHN DOE" POLICE OFFICERS 1-4 committed battery upon Plaintiff ELSA WAITHE when they strongly pushed her, without Plaintiff ELSA WAITHE's consent, and without any privilege or justification to do so.

147.  The circumstances presented to the Defendant POLICE OFFICERS at the time did not support the above-referred applications of force upon Plaintiff.

148.  Plaintiff was injured by the Defendant POLICE OFFICERS' non-consensual and unprivileged physical contact.

149.  As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

150.  Plaintiffs demand compensatory and punitive damages in a sum of money to be determined at trial, together with attorneys' fees and costs.

## NINTH CLAIM FOR RELIEF

### <u>NEGLIGENCE (State Law)</u>

151.  Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

152.  The Defendants, as a result of owing a general duty to civilians to exercise reasonable care in execution of their duties, owed a duty of care to Plaintiff, to prevent Plaintiff from being subjected to unjustified injury at the hands of police.

153.  The Defendants breached this duty, and were negligent in causing Plaintiff's injuries in the manner described herein.

154.  The Defendants' breach of their duty of care owed to Plaintiff was the direct and proximate cause of Plaintiffs' injuries.

155.  Plaintiff received both actual and substantial physical and mental injures as a result of the Defendant' breach of their duty owed to Plaintiff.

156.  As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### TENTH CLAIM FOR RELIEF
### <u>RESPONDIAT SUPERIOR AGAINST</u>
### <u>DEFENDANT CITY OF NEW YORK (State Law)</u>

157.  Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

158.  The Defendant POLICE OFFICERS were at all times acting within the scope of their employment as employees of Defendant CITY OF NEW YORK.

159.  The injuries sustained by Plaintiff as a result of the actions of the Defendant POLICE

OFFICERS were generally foreseeable and a natural incident of their employment by Defendant THE CITY OF NEW YORK, and of Defendant CITY OF NEW YORK's failure to provide them with adequate training and supervision.

160.  As a result of the actions of the Defendant POLICE OFFICERS, the Plaintiff was harmed.

161.  Defendant CITY OF NEW YORK is liable for the actions of the Defendant POLICE OFFICERS.

162.  As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### ELEVENTH CLAIM FOR RELIEF
### <u>NEGLIGENT TRAINING AND SUPERVISION AGAINST</u>
### <u>DEFENDANT CITY OF NEW YORK</u>

163.  Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

164.  Upon information and belief, Defendant City of New York failed to use reasonable care in the training and supervision of the aforesaid Defendant POLICE OFFICERS who participated in the assault, battery, use of excessive force and other violations of Plaintiff's constitutional rights in the manner described herein.

165.  Defendant City of New York knew, or should have known that the requirements, guidelines, and terms of its training for the Defendant POLICE OFFICERS were inadequate to prevent the Defendant POLICE OFFICERS from engaging in the wrongful conduct against Plaintiff heretofore alleged in this complaint.

166.  As a result of the above constitutionally impermissible conduct, Plaintiff was harmed.

167.  As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### TWELFTH CLAIM FOR RELIEF
### <u>NEGLIGENT HIRING AND RETENTION (State Law)</u>

168.  Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

169.  Defendant THE CITY OF NEW YORK failed to use reasonable care in the hiring and retention of the Defendant POLICE OFFICERS.

170.  Defendant THE CITY OF NEW YORK failed to use reasonable care in the training and supervision of the Defendant POLICE OFFICERS, permitting and enabling them to engage in the

wrongful conduct heretofore alleged in this Complaint.

171.  As a result, Plaintiff was harmed.

172.  As a result of the foregoing, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:          New York, New York
                April 25, 2016

Respectfully submitted,

_____~//s//~_____
SAMUEL B. COHEN [SC 7406]
ATTORNEY FOR PLAINTIFF
494 Eighth Avenue – Suite 1000
New York, New York 10001
T/F [212] 537-5919
Sam@SamCohenLaw.com

31